NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

OLIVER LARIS LARIS, *Appellant*.

No. 1 CA-CR 20-0308
FILED 4-20-2021

Appeal from the Superior Court in Maricopa County
No. CR2018-131805-001
The Honorable Warren J. Granville, Judge (Retired)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Linley Wilson
*Counsel for Appellee*

Maricopa County Legal Advocate's Office, Phoenix
By Andrew Charles Marcy
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Chief Judge Peter B. Swann joined.

**W I N T H R O P**, Judge:

**¶1**          Oliver Laris Laris ("Appellant") appeals his convictions and sentences for second degree murder, theft of means of transportation, and attempted trafficking in stolen property in the second degree. Appellant's counsel has filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), stating he has searched the record on appeal and found no arguable question of law that is not frivolous. Appellant's counsel therefore requests that we review the record for fundamental error. *See State v. Clark*, 196 Ariz. 530, 537, ¶ 30 (App. 1999) (stating that this court reviews the entire record for reversible error). This court allowed Appellant to file a supplemental brief *in propria persona*, but he has not done so.

**¶2**          We have appellate jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and 13-4033(A). Finding no reversible error, we affirm.

**FACTS AND PROCEDURAL HISTORY[1]**

**¶3**          A grand jury issued an indictment charging Appellant with Count I, second degree murder, a class 1 felony; Count II, theft of means of transportation, a class 3 felony; and Count III, attempted trafficking in stolen property in the second degree, a class 4 felony. *See* A.R.S. §§ 13-1104, -1814, -2307, and -1001. The State also charged Appellant's brother, Leonardo ("Leo"), with second degree murder and theft of means of transportation. The State alleged the murder (Count I) involved the use of

---

[1]      We view the facts in the light most favorable to sustaining the verdict and resolve all reasonable inferences against Appellant. *See State v. Kiper*, 181 Ariz. 62, 64 (App. 1994).

a deadly weapon or dangerous instrument. The State also alleged the existence of three statutory and other aggravating circumstances.

¶4 At trial, the State presented the following evidence: On Sunday, June 10, 2018, Appellant called the victim at 11:04 a.m. from a ZTE flip phone to arrange a test drive of a 2012 black Ford F-150 pickup the victim had listed for sale. After arranging the time, Appellant and Leo traveled to the victim's residence in a Dodge Journey SUV belonging to Appellant's wife. Appellant parked the Dodge Journey down the block from the residence and again called the victim from the ZTE flip phone at 11:50 a.m.

¶5 At approximately 11:55 a.m., the three men went for a test drive in the victim's pickup. Surveillance video from a nearby camera showed Leo getting in the driver's seat, the victim getting in the front passenger seat, and Appellant getting in the rear passenger seat. Cell phone data showed that during the test drive, the men traveled north on I-17, and then south on I-17 past the exit that would have led to the victim's residence. At some point during the test drive, the victim was severely beaten and strangled.

¶6 A witness was working on the back patio of his Phoenix home when he saw a black pickup skid to an abrupt stop in the alley behind his fence. He observed the passenger's door was opened and a Hispanic male, who appeared to be in distress or pain, was in the passenger's seat. The witness could see blood all over the passenger, including on his arm and head. Someone was holding the passenger, apparently to prevent him from getting out of the pickup. The driver hurriedly exited and ran around the pickup, closed the passenger door, and returned to the driver's seat. The pickup then "peeled its tires out" and drove away.

¶7 In the alley, the witness found a hat and a folded piece of paper that appeared to have fallen out of the pickup. He collected both and called 911 at 12:47 p.m. to report what appeared to be a kidnapping or "carjacking." The piece of paper had blood on it—which was later matched to the victim's DNA—and was a vehicle title for the 2012 black Ford F-150 pickup. Fingerprints from the victim, Appellant, and Leo were later identified on the title. The hat belonged to Appellant. The hat had blood on it, and a stain on the hat had DNA from the victim. Cell phone data showed both the victim's and Leo's phones were near the witness' residence at the time the pickup drove was observed in the alley.

¶8         Surveillance video showed the black Ford F-150 pickup returned to the victim's residence at 1:10 p.m.  The victim did not get out of the pickup.  Instead, Leo exited the pickup, got into the Dodge Journey, and followed as both vehicles left the area together.

¶9         Beginning at approximately 1:00 p.m., the victim's wife tried several times to call him, but the calls went to voicemail.  After speaking with the victim's wife, the victim's brother also tried calling him several times, but did not receive an answer.  The last GPS activity obtained from the victim's cell phone occurred sometime between 1:30 and 2:00 p.m.  Later that afternoon, the victim's family contacted the police to report the victim missing.  The victim's family never saw or spoke to the victim again after he went on the test drive.

¶10        The victim's family obtained records for the victim's cell phone, including the last phone number to call him, and they provided the records to the police.  Data associated with that last phone number revealed the phone was often at or near Appellant's residence.  The victim's family also found a Facebook advertisement listing the victim's black Ford F-150 pickup for sale.  The background images in the advertisement showed Appellant's house.

¶11        Police officers began conducting surveillance on Appellant's residence, and on June 26, 2018, a detective observed both the Dodge Journey and a black Ford F-150 pickup driving up to the house.  The Dodge Journey pulled into the driveway, but the pickup suddenly drove away, and the detective followed the pickup in an unmarked car.  The pickup then sped up, the driver took evasive actions, and eventually eluded the detective.  Meanwhile, the Dodge Journey pulled out of the driveway and drove away, but officers stopped the vehicle soon afterward.  Appellant and two other men were in the Dodge Journey.  A key to the victim's black Ford F-150 pickup was found in the Dodge Journey, as was Appellant's ZTE flip phone.  Shortly afterward, the black Ford F-150 pickup was found abandoned two to three miles away and impounded.

¶12        By the time police recovered the victim's pickup, its appearance had been altered from the original ad placed by the victim.  The wheel rims and lug nuts had been repainted, "4x4" stickers had been removed, and a different sticker had been added.  Both the front passenger's seat and the driver's seat had been stripped of their upholstery and covered with denim work shirts.  Additionally, the passenger's side seat belt and the vehicle's carpeting had been taken out.

4

¶13        Police officers found numerous small blood spots and stains throughout the pickup, with most found near the front passenger seat. The front passenger seat area had remnants of extensive blood pooling.

¶14        On July 12, 2019, after a monsoon rainstorm, the victim's naked body was discovered in a retention basin in south Phoenix. The victim's head had received at least twenty-three blows causing defects in the skull consistent with deadly blunt force trauma caused by an instrument such as a tire iron. One rib was fractured. Also, the victim had fractures on both ends of the hyoid (neck) bone and in the thyroid cartilage (Adam's apple), and his cricoid cartilage was crushed, all injuries consistent with strangulation.

¶15        At trial, Appellant testified extensively, as did Leo. Appellant admitted he and Leo were the two men shown in the surveillance video near the victim's residence and that he was the owner of the ZTE flip phone. He also admitted he hit the victim in the head with the tire jack and killed the victim by striking him repeatedly; however, Appellant asserted he acted in self-defense.

¶16        Appellant testified the victim was still alive when he dropped Leo off to get the Dodge Journey, and he planned to take the victim to the hospital, but the victim died en route. Appellant then drove to the retention basin in south Phoenix, and claimed he alone dragged the victim's body from the pickup and into a culvert, even though the grate covering the culvert was extremely heavy, the body was awkward to move, and a second person would likely have been necessary to accomplish the task. After hiding the body, Appellant drove to a nearby self-serve car wash, wiped down and washed most of the blood from the pickup, and dumped the rags, the tire jack, and other items in a dumpster. He was at the car wash "a long time," and sometime early Monday morning, he drove the victim's pickup home, hid his clothes in the backyard, snuck in through the back door, and showered.

¶17        Appellant subsequently removed the carpet, front seat covers, and front passenger's seat belt from the pickup. He admitted he was trying to sell the pickup to the two men he was with when arrested and that he tried to sell the pickup despite knowing it did not belong to him. On cross-examination, he also admitted lying throughout police interviews, to Leo's investigator, and during his testimony to the jury.

¶18        Leo testified that at approximately 11:00 a.m. on June 10, 2018, Appellant picked him up in the Dodge Journey and drove to the victim's

residence. According to Leo, during the test drive, he "heard" the victim hit Appellant, who then hit the victim several times. He did not see any of the blows allegedly struck by the victim or those struck by Appellant, however, because he was focused only on driving. Thus, Leo claimed he only heard "thumps" and sounds that mimicked a "hard object hitting a hard object."

¶19    Leo testified that, at some point, he pulled the pickup over, saw blood on the victim's arms and Appellant's face and hands, and yelled at Appellant that he wanted to go home. He switched seats with Appellant, who drove the pickup into an alley, where the passenger side door swung open. Leo denied holding the victim to keep him from escaping, injuring the victim's neck, or participating in any physical exchange.

¶20    Appellant dropped Leo off where the Dodge Journey was parked so Leo could help Appellant by driving the Dodge Journey home. According to Leo, the victim appeared to still be alive, and although he did not call the police, Leo claimed he urged Appellant to do so and to take the victim to the hospital. Leo further claimed that, at approximately 6:00 or 7:00 p.m. that evening, he drove to Appellant's residence to confirm that Appellant had taken the victim to the hospital, and Appellant assured Leo he had done so. Leo denied helping Appellant dump the victim's body and claimed he was not present when the victim died. On cross-examination, Leo acknowledged numerous inconsistencies in his testimony, that portions of his story changed during his testimony, and that he had trouble remembering what he had previously said.

¶21    Before the case was submitted to the jury for deliberation, Appellant requested jury instructions for the lesser-included offenses of manslaughter and negligent homicide, as well as a justification instruction for self-defense and for the use of force in crime prevention. The trial court found no evidence had been presented that would reasonably support an instruction for negligent homicide, but otherwise included Appellant's requested instructions in the final jury instructions. No party requested severance of the defendants' cases; nonetheless, the trial court ruled *sua sponte* that no antagonistic defenses or evidence had been presented that would require severance.

¶22    At the conclusion of the sixteen-day trial, which included approximately three days of deliberations, the jury convicted Appellant as charged, and convicted Leo of manslaughter and theft of means of transportation. The court found the jury's determination of guilt on the second degree murder charge meant the allegation of a dangerous felony

offense had been proven. The court also found the aggravating factor of presence of an accomplice was inherent in the jury's verdict.

**¶23**          Both Appellant and Leo waived an additional jury trial as to the presence of additional aggravating circumstances. At sentencing, the court found the State had proven the additional aggravating factor of emotional harm to the victim's family.

**¶24**          As to Appellant, the court imposed a slightly aggravated sentence of twenty years' imprisonment for Count I, a presumptive term of 3.5 years' imprisonment for Count II, and a presumptive term of 2.5 years' imprisonment for Count III. The court ordered that Counts I and II would run concurrently to each other, but consecutively to Count III. The court credited Appellant for 681 days of presentence incarceration, to be applied to Count III only. Appellant filed a timely notice of appeal.

## ANALYSIS

**¶25**          We have reviewed the record for reversible error and find none. *See Leon*, 104 Ariz. at 300; *Clark*, 196 Ariz. at 537, ¶ 30. The evidence presented at trial was substantial and supports Appellant's convictions and sentences. Appellant was represented by counsel at all stages of the proceedings and was given the opportunity to speak at sentencing. The proceedings were conducted in compliance with his constitutional and statutory rights and the Arizona Rules of Criminal Procedure.

**¶26**          After filing of this decision, defense counsel's obligations pertaining to Appellant's representation in this appeal have ended. Counsel need do no more than inform Appellant of the status of the appeal and of his future options, unless counsel's review reveals an issue appropriate for petition for review to the Arizona Supreme Court. *See State v. Shattuck*, 140 Ariz. 582, 584-85 (1984). Appellant has thirty days from the date of this decision to proceed, if he desires, with a *pro per* motion for reconsideration or petition for review.

**CONCLUSION**

¶27 Appellant's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:    AA